## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

Case No. 14-cr-20083

v.

Hon. Linda V. Parker

MAURICE HAYNES,

**Oral Argument Requested**

     Defendant.

---

Nancy A. Abraham (P42060)
Assistant United States Attorney
600 Church Street, Room 210
Flint, Michigan 48502
(810) 766-5034
Nancy.abraham@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW PC
370 E. Maple Rd., Third Floor
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Maurice Haynes*

---

## <u>EMERGENCY MOTION FOR COMPASSIONATE RELEASE</u>

Defendant Maurice Haynes ("Haynes"), through counsel, WADE FINK LAW, P.C., moves this Court for an order reducing his sentence and releasing him from prison under the compassionate release provisions of 18 U.S.C. § 3582, as modified by the First Step Act. FCI Milan, where Haynes is currently housed, reported a large outbreak of COVID-19 and continues to report the virus' presence in the facility. Additionally, Haynes has served over 89% of his 120-month

sentence and is set to be released to a half-way house in a little over five months - on November 24, 2020.

Pursuant to Local Rule 7.1, the undersigned sought concurrence on this motion on June 18,  2020, which was denied.

Date:  June 19, 2020                                   Respectfully Submitted,

                                                       WADE FINK LAW P.C.

                                                       /s/ Wade G. Fink
                                                       Wade G. Fink (P78751)
                                                       *Attorneys for Defendants*
                                                       370 E. Maple Rd., Third Floor
                                                       Birmingham, MI 48009
                                                       248-712-1054
                                                       wade@wadefinklaw.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                Case No. 14-cr-20083

v.

                                Hon. Linda V. Parker

MAURICE HAYNES,

                              **Oral Argument Requested**

      Defendant.

---

Nancy A. Abraham (P42060)
Assistant United States Attorney
600 Church Street, Room 210
Flint, Michigan 48502
(810) 766-5034
Nancy.abraham@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW PC
370 E. Maple Rd., Third Floor
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Maurice Haynes*

---

## BRIEF IN SUPPORT OF EMERGENCY MOTION FOR COMPASSIONATE RELEASE

## **<u>TABLE OF CONTENTS</u>**

**TABLE OF AUTHORITIES**………………………………………………iii

**STATEMENT OF ISSUES**……………………………….……....….…v

**I.**    **INTRODUCTION AND FACTUAL BACKGROUND**…….….…..…..…1

**II.**   **ARGUMENT**……………………………………....…………..………2

      **A.** THE PRISON SETTING COMBINED WITH HAYNE'S
          UNDERLYING HEALTH CONDITIONS CONSTITUTE A
          COMPELLING AND EXTRAORDINARY CIRCUMSTANCE
          WARRANTING RELEASE…………………………………..………..2

          1.  Prisons Are "Tinder Boxes For Infectious Disease………………5

          2.  Haynes' Underlying Health Conditions………………………..12

          3.  A Sentence Reduction Is Also Consistent With The Sentencing
             Commission's Policy Statements And The Factors Outlined In §
             3553(a)……………………..……………………………….17

      **B.** ALTERNATIVELY, THIS COURT SHOULD PERMIT HAYNES
          TO COMPLETE HIS SENTENCE IN HOME CONFINEMENT….23

**III.**  **CONCLUSION**…………………………………………….…...24

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Livas v. Myers*, No. 2:20-CV-00422, 2020 U.S. Dist. LEXIS 71323 (W.D. La. Apr. 22, 2020)…………………………………………………………………………..15

*United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321 (6th Cir. June 2, 2020)……………………………………………………………………………….4

*United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282 (E.D. Mich. Apr. 20, 2020)…………………………………………………………………………….11

*United States v. Belle*, No. 3:18-cr-117-(VAB)-1, 2020 U.S. Dist. LEXIS 78784 (D. Conn. May 5, 2020)……….…………………………………………………………14,16

*United States v. Butler* No. 18 Cr. 834 (PAE), Dkt. 461, 2020 U.S. Dist. LEXIS 61021 (S.D.N.Y. Apr. 7, 2020)……………………………………………………...23

*United States v. Cassidy*, No. 17-CR-116S, 2020 U.S. Dist. LEXIS 84692 (W.D.N.Y. May 13, 2020)………………………………………………………..5

*United States v. Credidio*, No. 19 Cr. 111 (PAE), Dkt. 62, 2020 U.S. Dist. LEXIS 58238 (S.D.N.Y. April 2, 2020)……………………………………………………..23

*United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 U.S. Dist. LEXIS 84469 (D. Conn. Apr. 30, 2020)………………………………………………………….19

*United States v. Echevarria*, 2020 U.S. Dist. LEXIS 77894 (D. Conn. May 4, 2020)………………………………………………………………4

*United States v. Foreman*, No. 3:19-cr-62 (VAB), 2020 U.S. Dist. LEXIS 82330 (D. Conn. May 11, 2020)……………………………………………………...19

*United States v. Griggs*, No. 4:18-cr-00216-DCC, 2020 U.S. Dist. LEXIS 90412 (D.S.C. May 22, 2020)…………………………………………………………19

*United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451 (S.D.N.Y. Apr. 10, 2020)…………………………………………………………13

*United States v. Meron*, No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 97687 (E.D. Cal. June 2, 2020)..………………………………………………………………..4

*United States v. Moore-Brown*, No. 3:17-CR-129, 2020 U.S. Dist. LEXIS 81293 (M.D. Pa. May 8, 2020)..………………………………………………………….4

*United States v. Oliver*, No. 2:17-cr-20489, 2020 U.S. Dist. LEXIS 92939 (E.D. Mich. May 28, 2020)..…………………………………………………………….8

*United States v. Pagliuca*, No. 17-CR-432 (CS), 2020 U.S. Dist. LEXIS 86932 (S.D.N.Y. May 18, 2020)…….………………………………………………19

*United States v. Pomante*, No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich. May 15, 2020………………………………………………………………9,25

*United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355 (E.D. Mich. May 21, 2020)..……………………………………………………………9

*United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020)..…………………………………………………….5,20

*United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020)....……………………………………………21,22

*United States v. Somerville*, No. 2:12-CR-225-NR, 2020 U.S. Dist. LEXIS 93935 (W.D. Pa. May 29, 2020)…….………………………………………………19

*United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414 (C.D. Cal. Apr. 10, 2020)..………………………………………….13

*United States v. White*, No. 13-cr-20653-1, 2020 U.S. Dist. LEXIS 88542 (E.D. Mich. May 20, 2020) ………………………………………………...10

## Statutes and Rules

18 U.S.C. § 3582………………………………………………….………*passim*

21 U.S.C. § 841(a)(1)…………………………………………….………...1

U.S.S.G. § 1B1.13……………………………………………………………...20

## STATEMENT OF ISSUES

1.     Has Haynes demonstrated a compelling and extraordinary circumstance warranting compassionate release in light of his upcoming release date, history of blood pressure, asthma, and lung issues, and the particularly dangerous situation at FCI Milan, all of which heighten his risk of developing life-threatening complications should he contract COVID-19?

Defendant answers, yes.

2.     Has Haynes demonstrated that a reduction in sentence would be consistent with Section 3353(a) factors and policy statements issued by the Sentencing Commission, which require the Court to consider Haynes' danger to society and other elements, when Haynes has taken steps to better himself since incarcerated?

Defendant answers, yes.

## I.    INTRODUCTION AND FACTUAL BACKGROUND

On February 19, 2014, Maurice Haynes was indicted for federal drug charges arising out of two separate traffic stops. The first stop was initiated on March 6, 2013 after a Michigan State Police Officer allegedly observed Haynes speeding on I-475 and pulled him over. Complaint, ECF No. 1, PageID.2. Upon approaching Haynes' vehicle, the officer could allegedly smell the odor of marijuana and asked Haynes to step out of the vehicle. Haynes indicated that a small baggie of marijuana was under his driver's seat, and a subsequent search of the vehicle and Haynes resulted in the seizure of 15 grams of marijuana and 32.6 grams of heroin. *Id.*

Almost a year later on February 9, 2014, Haynes was stopped again on I-475 by the Flint Area Narcotics Group ("FANG") after Haynes was allegedly observed making an illegal lane change upon leaving a residence FANG was surveilling. *Id.* A search of Haynes' person revealed 24 grams of heroin in his coat pocket. *Id.*

On September 4, 2014, Haynes took responsibility and pled guilty to one count charged in the indictment – possession with intent to distribute heroin in violation of 21 U.S.C. § 841. Indictment, ECF No. 8, PageID.12. Under the Rule 11 plea agreement, Haynes sentencing guideline range was 151 to 188 months. Plea Agr't, ECF No. 20, PageID.40. In his sentencing memorandum, Haynes urged this Court for a departure from the sentencing guidelines, as his status as a purported career offender had doubled his potential exposure compared to the guidelines if he

1

had a category I criminal history. Deft's Sent. Memo, ECF No. 24, PageID.63. On February 3, 2015 Haynes was subsequently sentenced to 120 months for count one.

Haynes is currently serving his sentence at FCI Milan, in Milan, Michigan, and his release date is August 17, 2021. However, Haynes is scheduled to be released to a halfway house in roughly five months on November 24, 2020. To date, **Haynes has served over four fifths of his sentence**.[1] Haynes is 48 years old, obese, and has a history of blood pressure, lung, and asthma issues.  Because of his underlying health conditions, Haynes is at high risk for developing catastrophic health consequences should he contract COVID-19.

The emergency nature of this motion is amplified by the COVID-19 infection rate within FCI Milan, which has consistently reported positive cases of COVID-19 among inmates for almost two months. In fact, the facility has confirmed 142 cases of COVID-19 between inmates and staff and 3 inmate deaths.  Indeed there is reason to believe that the infection rate within FCI Milan is much higher than the Bureau of Prisons ("BOP") is reporting, due to a lack of widespread testing. The BOP's inaction is especially frightening given Haynes' health. Further, within FCI Milan specifically, there has been a failure to prevent the spread of COVID-19. The BOP's actions during the pandemic have become so egregious and unsafe that the Union

---

[1] Haynes only has 14 months, or 11%, of his sentence remaining.

representing BOP across the county filed an Imminent Danger complaint with the Occupational Safety and Health Administration, discussed herein.

Haynes now files this motion for his compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). This Court should grant such relief for the following reasons: first, Haynes has satisfied the exhaustion requirement contained in Section 3582. Second, Haynes asserts that the global health crisis, in combination with his underlying health conditions, constitutes compelling and extraordinary circumstances warranting his compassionate release because the conditions render him especially vulnerable to developing a severe case of COVID-19. Third, a reduction in Haynes' sentence would not be contrary to the factors outlined in Section 3553(a) and would be consistent with the Sentencing Commission's policy statements.

In the alternative, Haynes asks that this court allow him to serve out the remaining 14 months of his sentence in home confinement or on similar supervised release conditions.

## II.   <u>ARGUMENT</u>

**A.   THE PRISON SETTING COMBINED WITH HAYNES' UNDERLYING HEALTH CONDITIONS CONSTITUTES A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE WARRANTING RELEASE.**

18 U.S.C. § 3582, as amended by the First Step Act, provides that a defendant must "fully exhaust [] all administrative rights" or otherwise "wait for 30 days after

the warden's receipt of [their] request." *United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321, at *5 (6th Cir. June 2, 2020). [2]

Haynes has exhausted his administrative requirements. On April 22, 2020, Haynes submitted his first petition to the BOP requesting home confinement from the Warden of FCI Milan. On June 9, 2020 Haynes also submitted a request for compassionate release. Although Haynes technically requested home confinement in his initial petition over thirty days ago, he asks this Court to view his petition liberally and construe it as a request for compassionate release. See *United States v. Meron*, No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 97687, at *7 (E.D. Cal. June 2, 2020) (finding that although home confinement and compassionate release are two different remedies, it "does not necessarily mean the court should not construe defendant's [request for home confinement] as sufficient to trigger any exhaustion clock applicable to compassionate release requests."); *United States v. Echevarria*, 2020 U.S. Dist. LEXIS 77894, at *2 (D. Conn. May 4, 2020) (finding the exhaustion requirement satisfied where a defendant submitted a request for home confinement over 30 days prior); *United States v. Moore-Brown*, No. 3:17-CR-129, 2020 U.S. Dist. LEXIS 81293, at *3 (M.D. Pa. May 8, 2020) (treating a defendant's request

---

[2] All unpublished cases attached as **Exhibit D.**

"for compassionate release to home confinement" as a request for compassionate release, starting the clock for exhaustion, but ultimately finding no exhaustion).

Having exhausted, Section 3582 next instructs a court considering compassionate release to determine "whether extraordinary and compelling reasons exist for a sentence reduction" and whether "a sentence reduction is consistent with the applicable Sentencing Guidelines provisions." *United States v. Cassidy*, No. 17-CR-116S, 2020 U.S. Dist. LEXIS 84692, at *4 (W.D.N.Y. May 13, 2020) (quoting § 3582(c)(1)(A)). Haynes submits that his underlying health conditions in light of the extreme ease of transmission of COVID-19, constitutes an extraordinary and compelling circumstance. Haynes also submits that his release would be consistent with the Sentencing Guidelines.

## 1.    Prisons Are "Tinder Boxes For Infectious Disease"[3]

Haynes is being housed at FCI Milan, a BOP facility located in southeast Michigan, an area reporting 66% of the state's total confirmed COVID-19 cases, and 79% of the state's deaths.[4] In fact, the City of Detroit, positioned only one county

---

[3] *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *2 (E.D. Pa. Apr. 1, 2020).

[4] *Michigan Coronavirus Cases Spike, Officials Cite Testing Backlog,* https://www.mlive.com/public-interest/2020/05/michigan-coronavirus-cases-spike-officials-cite-testing-backlog.html

over from FCI Milan, has been identified not only as the epicenter of the COVID-19 outbreak in Michigan, but also a national hotspot for the virus.[5]

It is not surprising therefore, that the virus which devastated the community surrounding FCI Milan, found its way inside the prison. To date, FCI Milan has reported 142 cases of COVID-19, and 3 inmate deaths – including, unfortunately, one of Haynes close friends Willie Peterson.[6] The government will likely argue that the number of confirmed cases within the facility has recently decreased, but there are serious reasons to doubt the accuracy of the numbers the BOP is reporting – simply because only an extremely small portion of inmates are being tested. In FCI Milan specifically, only 175 tests have been conducted. This amounts to a measly 13% of the total population. Further, 75 of those tests have come back positive, meaning that **roughly half (49%) of those who were tested at FCI Milan have tested positive for the virus**.[7]

The overall testing rate within the BOP is similarly abysmal. Of the 146,000 inmates within the Bureau's custody, only 17,650 have been tested – less than 13%

---

[5] *A National Hotspot, The Coronavirus in Detroit, https://sph.umich.edu /news/2020posts/a-national-hotspot-coronavirus-in-detroit.html*

[6] *See* COVID-19 Cases, *supra* note 2; BOP Press Release, Inmate Death at FCI Milan, https://www.bop.gov/resources/news/pdfs/20200501_press_release_ mil.pdf.

[7] *See* COVID-19 Inmate Testing Information, https://www.bop.gov/ coronavirus/ (last visited Jun. 19, 2020).

of the total population.[8] And of those inmates that were swabbed for COVID-19, **a staggering 1 in 3 of them tested positive** for COVID-19.[9] Further, representatives from the BOP specified that "[t]he goal of [its] reporting is to provide the public with **insight** as to the current status of our COVID-19 response at various facilities . . . and does not necessarily account for the unconfirmed (non-tested) cases."[10] One staff member working within FCI Oakdale, the first BOP facility to report a COVID-19 inmate fatality, stated that the BOP was not testing inmates "because **they assume** if someone has symptoms, they have it."[11]

These unconfirmed, non-tested cases are most likely spreading like wildfire in BOP facilities. The small number of federal prisons who have begun to conduct widespread testing corroborate this. For instance, the BOP reported that FCI

---

[8] *See* COVID-19 Inmate Testing Information, *supra* note 7.

[9] *More Than 1 out of 3 Tested Federal Inmates Were Positive for Coronavirus*, https://abcnews.go.com/Politics/tested-federal-inmates-positive-coronavirus/story?id=71275461

[10] *Bureau of Prisons Underreporting COVID-19 Outbreak in Prison,* https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#d517db87ba32

[11] '*Something is Going to Explode': When Coronavirus Strikes a Prison*, https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html

Lompoc, which houses 996 inmates,[12] reported 879 confirmed cases of COVID-19[13]

– surpassing the total infections among residents within the county where the facility

was located.[14] FMC Fort Worth and FCI Terminal Island have similarly reported

shockingly high infection rates after mass testing.[15] This spate of testing

demonstrates that COVID-19 is circulating in prisons in much greater numbers than

the BOP's reporting suggests.

Haynes himself reports that inmates at FCI Milan are not tested unless they

are outwardly showing recognized symptoms or complain to staff. *United States v.*

*Oliver*, No. 2:17-cr-20489, 2020 U.S. Dist. LEXIS 92939, at *17 (E.D. Mich. May

28, 2020) ("Although the [FCI Milan] only has five active cases among its inmate

population as of May 26, 2020, the fact that prisoners are only tested for the virus if

they display symptoms suggests that number may in reality be much higher"). The

---

[12] FCI Lompoc, https://www.bop.gov/locations/institutions/lof/

[13] *See* COVID-19 Cases, *supra* note 2.

[14] *Lompoc Prison COVID-19 Cases Skyrocket to 599*, https://www.independent.com/2020/05/07/lompoc-prison-covid-19-cases-skyrocket-to-599/

[15] *More Than 600 Inmates Test Positive for COVID-19 at Federal Prison in Fort Worth*, https://www.nbcdfw.com/news/coronavirus/more-than-600-inmates-test-positive-for-covid-19-at-federal-prison-in-fort-worth/2367644/; *Nearly Half of Inmates at Terminal Island Federal Prison Infected with Coronavirus*, https://www.dailybreeze.com/2020/04/29/nearly-half-of-inmates-at-terminal-island-federal-prison-infected-with-coronavirus/

lack of testing is especially alarming considering the CDC's recent findings that at least 35% of individuals who contract COVID-19 are asymptomatic (possibly up to 50%) and, further, that 40% of those who do spread the virus once infected do so prior to symptom onset.[16] *See also In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017, at *1 (N.D. Cal. Mar. 19, 2020) (noting that "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . **We don't know who's infected**" (emphasis added)).

Accordingly, many district courts rightly express that it matters not how many cases the BOP has "confirmed" because that number is meaningless without adequate testing. *United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355, at *8-9 (E.D. Mich. May 21, 2020) ("the Court is not persuaded that a lack confirmed cases alone [in a BOP facility] is a compelling reason not to grant relief if a defendant otherwise qualifies"); *United States v. Pomante*, No. 19-20316, 2020 U.S. Dist. LEXIS 85626, at *9 (E.D. Mich. May 15, 2020) ("Until the BOP increases its testing capacity, a lack of confirmed cases has very little bearing on the amount of actual cases in a federal prison").

---

[16]     *COVID-19      Pandemic      Planning      Scenarios*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html

District courts have further noted that despite the decrease in positive cases, FCI Milan, specifically, still presents a danger to inmates housed within the facility with underlying health conditions. *See United States v. White*, No. 13-cr-20653-1, 2020 U.S. Dist. LEXIS 88542, at *14-15 (E.D. Mich. May 20, 2020) ("Although the infection rate at Milan appears to be decreasing, the continued presence of the virus at the facility suggests it presents an ongoing risk, especially to vulnerable prisoners") (internal citations omitted); *Nazzal*, 2020 U.S. Dist. LEXIS at *11-12 ("Despite the government's attempt to minimize the status of the pandemic crisis at FCI Milan, it is undisputed that the progress of the outbreak is ongoing, and the facility still has active inmate infections").

To make matters worse, correctional settings inherently prevent inmates from protecting themselves from infectious disease like COVID-19 because of prison living conditions. Although BOP facilities have been on lockdown for months to try to combat the unique challenges prisons are facing, inmates still remain in close proximity to each other, unable to practice social distancing, and share the same ventilation system, phones, showers, computers, and so on without any sanitation. All it takes is one sneeze, cough, or breath from an infected inmate to release respiratory droplets containing infections particles into the ventilation system or on

10

to any surface. Accordingly, both the CDC and courts within this district have emphasized the heightened dangers inmates face due to their living situation.[17]

Moreover, Haynes reports that inmates who have been separated for quarantine in anticipation of release are currently in a unit directly above the inmates who tested positive for COVID-19. Despite close proximity to individuals confirmed with COVID-19, the inmates in the quarantine unit still use the same computers and phones, without sanitization, that Haynes and the rest of population similarly use. Accordingly, if granted release Hayne requests that he be permitted to quarantine in his home.

Things have apparently gotten so bad within BOP facilities that the Union which represents BOP guards across the country filed an Imminent Danger complaint with the Occupational Safety and Health Administration ("OSHA"). **Exhibit A**, OSHA Complaint. The complaint alleges that staff, including those working at FCI Milan, have not been allowed to properly self-quarantine after

---

[17] *See United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282, at *11 (E.D. Mich. Apr. 20, 2020) ("There can be little doubt that incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities"); *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced").

coming into contact with inmates suspected of having COVID-19, have not been provided the proper personal protection equipment, and have even been called back to work after being sent home for possible exposure. *Id.* The complaint concludes that "[BOP's] actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities. The agency's actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities." *Id.*

The dire warnings contained in the OSHA complaint were, unfortunately, a prediction of the future, as 85 inmates within the Bureau's custody have tragically lost their lives to date .[18] It appears that nothing has changed with FCI Milan since the OSHA complaint was filed either. Haynes reports that staff is not actively asking inmates if they are experiencing symptoms, and only some officers are wearing masks. The only monitoring the facility has conducted are two temperature checks, dating back to March.

Additionally, FCI Milan continues to remain in lockdown, which was implemented in March,  in an attempt to slow the transmission of the virus. However, as previously noted, a lockdown alone will most likely not prevent the spread of COVID-19 even if inmates are housed in individual cells – because they "typically

---

[18] *See* COVID-19 Cases, *supra* note 2.

share the same ventilation system with prisoners in other cells."[19] The OSHA complaint also commented on this issue, stating that the BOP has "not implemented engineering controls such as high efficiency air filters or air scrubbers to minimize the airborne nature of this virus or otherwise improved the ventilation rates in the environment." **Ex. A.** The ineffectiveness of lockdowns is demonstrated by the fact that over 6,000 inmates have contracted COVID-19 even with the BOP implementing a facility wide lockdown for the past three months.

In short, despite BOP efforts, the bottom line is that "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection." *United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414, at *5-6 (C.D. Cal. Apr. 10, 2020). *See also United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451, at *7 (S.D.N.Y. Apr. 10, 2020) ("The crowded nature of federal detention centers . . . present an outsize risk that the COVID-19 contagion, once it gains entry, will spread."). With the lackluster efforts taken by FCI Milan to contain COVID-19, it is a very real possibility that Haynes remaining 14 months of incarceration may be transformed into a death sentence.

---

[19] *See* Congressional Research Service, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release* at 1. https://crsreports.congress.gov/ product/pdf/R/R46297.

2.      **Haynes' Underlying Health Conditions**

Haynes is even more at risk than the general population at FCI Milan for catastrophic health consequences should he contract COVID-19. Haynes is a clinically obese 47-year old, who also has a history of asthma, lung, and blood pressure issues. Each of these four underlying conditions will be addressed in turn. All heighten Haynes' vulnerability to developing a severe case of COVID-19 on their own.

First, the CDC explicitly recognizes that people with asthma are at high-risk for severe illness from COVID-19.[20] Accordingly, "numerous courts within this Circuit have held that a defendant's pre-existing health conditions—respiratory conditions in particular—in combination with the increased risks of COVID-19 in prisons constitute 'extraordinary and compelling reasons' warranting relief." *United States v. Belle*, No. 3:18-cr-117-(VAB)-1, 2020 U.S. Dist. LEXIS 78784, at *10 (D. Conn. May 5, 2020). Haynes is one such person with respiratory ailments.

Upon information and belief, Haynes suffered from asthma as a child, requiring the use of an inhaler. As Haynes got older into his 20s, his asthma seemed to improve but researchers have found that individuals with childhood asthma "**tend**

---

[20] *People Who Are At Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

**to experience reappearing symptoms through their 30s and 40s.**[21]Additionally, upon information and belief, Haynes also experiences daily effects of a traumatic lung injury. At the age of 18, Haynes was shot. As a result he required a chest tube and suffered lung damage. Haynes reports that he finds it hard to breathe when exercising, and has a tremendously difficult time fighting off the common cold when he gets it.

Haynes' childhood asthma, lung damage, and his body's struggle to fight off even the common cold is particularly concerning given the fact that COVID-19 attacks the respiratory system. The virus becomes deadly when it works its way down to the lungs.[22] As one court stated, "[m]ost people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment. In some cases, however, COVID-19 causes severe respiratory issues." *Livas v. Myers*, No. 2:20-CV-00422, 2020 U.S. Dist. LEXIS 71323, at *3 (W.D. La. Apr. 22, 2020). Haynes has already demonstrated that his body is unable to handle a virus which causes very mild respiratory illness for the average person. Should he contract COVID-19, a much more aggressive virus than

---

[21] *Can Asthma Reappear in Adults After Disappearing Years Ago?* https://asthmaandallergies.org/asthma-allergies/adult-onset-asthma/

[22] *How This Coronavirus Kills Its Victims,* https://www.latimes.com/science/story/2020-02-29/how-this-coronavirus-kills-its-victims

the common cold, it may result in the devastating consequences referenced by the court in *Livas*. The government itself has even acknowledged the potential danger of these conditions. *See Belle*, 2020 U.S. Dist. LEXIS at *12 (noting the government's statement that "there is no doubt that any respiratory condition[] can materially increase an inmate's risk from COVID-19 and can be appropriate grounds for compassionate release").[23]

Second, upon information and belief, Haynes' has periodically experienced high blood pressure – another underlying condition which the CDC recognized as heightening an individual's susceptibility to serious complications if infected with COVID-19 in a recent study.[24] Many district courts have agreed with such study, the CDC's *Interim Clinical Guidance for Management of Patients with Confirmed*

---

[23] *Belle*'s motion for compassionate release was ultimately denied because his medical conditions did not outweigh the risk he posed to society. Unlike Haynes, Belle is a 26 year old, who had served less than half of his sentence, was convicted of a violent crime, and had a history of violent incidents in prison as well. Conversely, Haynes has served 89% of his sentence and has no history of violence despite a sizeable criminal history, see *infra* Section A.3.

[24] *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers for Disease Control and Prevention*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-managementpatients.html, ("Heart disease, hypertension, prior stroke, diabetes, chronic lung disease, and chronic kidney disease have all been associated with increased illness severity and adverse outcomes").

*Coronavirus Disease*, and cited its findings in concluding that hypertension increases an inmate's risk.[25]

Upon information and belief, Haynes has had blood pressure readings in the high range as recently as the beginning of March. In fact, Haynes was asked to begin medication due to the high readings but declined. Health officials in the BOP, told Haynes his decision to forgo medication was fine as long as he maintained his weight and continued to exercise. However, right after said conversation Haynes and other inmates at FCI Milan were put on lockdown as part of the BOP's COVID-19 precautionary measures. Haynes has remained in lockdown for over three months now, during the first half of which he was only permitted to go outside for 20 minutes a day. Consequently, Haynes has not been able to follow the directions he was given in lieu of taking high blood pressure medication. He can no longer exercise regularly and has gained at least ten pounds. It is likely that Haynes now has high blood

---

[25] *See United States v. Pinkley,* No. 05-cr-30104, 2020 U.S. Dist. LEXIS 79276, at *7 (C.D. Ill. May 5, 2020) ("Further, Defendant suffers from hypertension, a condition that increases the serious risks that COVID-19 presents for Defendant"); *United States v. Scparta*, No. 18-cr-578 (AJN), 2020 U.S. Dist. LEXIS 68935, at *29 (S.D.N.Y. Apr. 19, 2020) ("The Centers for Disease Control has identified hypertension as a comorbidity that increases the likelihood of serious risk from COVID-19); *United States v. Lacy*, No. 15-CR-30038, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) ("Besides obesity, Defendant suffers from hypertension and diabetes, both of which he manages with medication. Any one of these three factors alone would increase the serious risks of COVID-19 for Defendant") (emphasis added)).

pressure and should be being medicated given his weight gain and inability to exercise.[26]

In addition to heightened vulnerability due to respiratory issues and high blood pressure, Haynes faces an increased risk of developing a severe case of COVID-19 if infected with the virus because he is medically obese. Studies have found that individuals with a BMI over 30 are at an increased risk for serious complications if they contract COVID-19.[27] Upon information and belief, with a BMI of 34.1kg/m2, Haynes falls into this category.[28] *See also United States v.*

---

[26] According to a study conducted by the American Heart Association's High Blood Pressure Research Scientific Session 2014, a weight gain of just five pounds can increase an individual's blood pressure. https://newsarchive.heart.org/small-weight-gain-can-raise-blood-pressure-in-healthy-adults/

[27] *See* Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission. Clinical Infectious Diseases, https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333 ("Of the 3615 individuals who tested positive for COVID-19, 775 (21%) had a body mass index (BMI; $kg/m^2$) 30–34"); Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019, CDC, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_cid=mm6915e3_w (defining obesity as a body mass index $\geq 30$ $kg/m^2$ and finding that among patients age 18–49 and 50–64, obesity was the most common comorbidity); Arthur Simmonet et al., High Prevalence of Obesity in Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) Requiring Invasive Mechanical Ventilation, https://onlinelibrary.wiley.com/doi/full/10.1002/oby.22831 (defining obesity as BMI > 30 and concluding that "[d]isease severity increased with BMI. Obesity is a risk factor for SARS-CoV-2 severity, requiring increased attention to preventive measures in susceptible individuals").

[28] Haynes reports that he is 5 foot 7 inches and currently weighs 218 pounds. According to a BMI calculator on the CDC's website, his BMI is 34.1,

*Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 U.S. Dist. LEXIS 84469, at *8 (D. Conn. Apr. 30, 2020) (granting compassionate release to an inmate with a BMI over 30 based on an study which found that "obesity of patients was the single biggest chronic factor, after age, in whether those with COVID-19 had to be admitted to a hospital" and defining obesity "as a BMI of 30 and higher").[29]

In sum, Haynes is at a heightened risk for developing catastrophic health consequences should he contract COVID-19 because of his respiratory issues, high blood pressure, and obesity. Such conditions, therefore, when viewed in light of the high probability that Haynes will be exposed to COVID-19, which is circulating in

---

https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html.

[29] *See also United States v. Somerville*, No. 2:12-CR-225-NR, 2020 U.S. Dist. LEXIS 93935, at *21-22 (W.D. Pa. May 29, 2020) (granting the compassionate release of an inmate with a BMI of 33.4 because "hypertension and obesity have proven to be 'the most common comorbidities' associated with increased risk of infection, grave illness, and death due to COVID-19"); *United States v. Griggs*, No. 4:18-cr-00216-DCC, 2020 U.S. Dist. LEXIS 90412, at *14 n.7 (D.S.C. May 22, 2020) (granting compassionate release of an inmate with a BMI of 30.3); *United States v. Foreman*, No. 3:19-cr-62 (VAB), 2020 U.S. Dist. LEXIS 82330, at *8 (D. Conn. May 11, 2020) (reducing an obese inmate's sentence "even if her body mass index is not high enough to create the highest risk"); *United States v. Pagliuca*, No. 17-CR-432 (CS), 2020 U.S. Dist. LEXIS 86932, at *2 n.2 (S.D.N.Y. May 18, 2020) (granting the compassionate release of an inmate although he was "not so obese as to meet the CDC criterion for that risk factor, which is a body mass index ("BMI") of 40 [because] he is close, with a BMI of 36.6").

FCI Milan, present compelling and extraordinary reasons for his compassionate release.

### 3. A Sentence Reduction Is Also Consistent With The Sentencing Commission's Policy Statements And The Factors Outlined In § 3553(a).

In addition to finding a compelling and extraordinary circumstance warranting compassionate relief, a court considering a defendant's motion under Section 3582(c)(1)(A) must decide whether a sentence reduction would "be consistent with the applicable policy statements issued by the Sentencing Commission" and supported by the "factors set forth in section 3553(a)." § 3582(c)(1)(A).

### a.   *Policy Statements*

Section 3582(c)(1)(A) is accompanied by a policy statement and commentary promulgated by the Sentencing Commission. The relevant section states that a court may reduce a sentence for "extraordinary and compelling reasons," including situations, among others, where an individual is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A). This Court has the authority to decide what is extraordinary and compelling and is not limited by, only guided by, the policy statements. *Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718 * at 4, 6, (E.D. Pa. Apr. 1, 2020)

Haynes is clinically obese, has a history of asthma, respiratory issues, and high blood pressure. He is at an increased risk for developing life-threatening conditions should he contract COVID-19 – and with the constant COVID-19 infection among inmates at FCI Milan, it is likely that Haynes will come into contact with the virus at some point. If infected with a severe or debilitating case of COVID-19, Haynes will certainly have a difficult time caring for himself. Thus, the defendant urges this Court to find that this qualifies as an extraordinary or compelling reason, favoring his early release. *United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418, at *7 (E.D.N.Y. Apr. 10, 2020).

### b.    *§ 3553(a) Factors*

Similarly, the application of the § 3553(a) factors militates towards Haynes' compassionate release. In considering what is "sufficient but not greater than necessary, to comply with the purposes of [sentencing]", § 3553(a) instructs a court to consider the following:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)** to afford adequate deterrence to criminal conduct;
>>
>> **(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** [the kinds of sentence and sentencing range provided for in the USSG]

**(5)** any pertinent [Sentencing Commission policy statement]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense

*Sawicz*, 2020 U.S. Dist. LEXIS 64418 at 7, 8 (summarizing § 3553(a)).

First, Haynes acknowledges the serious nature of the crimes he committed which landed him behind bars. At his plea hearing, Haynes took accountability for the drug charges. ECF No. 20, PageID.41. Although Haynes was no stranger to the criminal justice system prior to this conviction, it was the most serious of any he had accumulated by far.[30] Haynes, therefore, viewed his ten year federal prison sentence as a wake-up call, and has made steps to turn his life around while incarcerated. **Exhibit B**, Sonya Haynes Letter. ("I can honestly say that I've witnessed so much

---

[30] Prior to pleading guilty, Haynes had 8 prior convictions for drug charges. ECF No. 7, PageID.11. However, these convictions involved relatively small quantities and were not violent – as Haynes states he was only a street-level dealer. ECF No. 24, PageID.66.

change and growth within Mr. Haynes. [Specifically,] the way he speaks and puts such value on life, its' lessons, and the future. . . he has become a changed man.").

In fact, Haynes has taken advantage of numerous BOP programs in preparation for his release. Haynes has successfully completed the Residential Drug Abuse Program and finished courses in Microsoft, parenting, job interviewing, checking and savings, political science, and is half way towards obtaining his associates degree in business management from Ashworth College (student number AC1601169). Should Haynes be released five months earlier than scheduled, he will live with his wife and son and be gainfully employed by Dubz Deli as a janitor and maintenance worker. **Exhibit C**, Dubz Deli Letter. He is ready to work hard and reunite with his loving family who eagerly awaits his return.

In moving this court for a reduction in his sentence, Haynes is not trying to take advantage of the unfortunate circumstances ravaging the country by asking to be released months into his sentence. *See e.g. United States v. Credidio*, No. 19 Cr. 111 (PAE), Dkt. 62, 2020 U.S. Dist. LEXIS 58238 (S.D.N.Y. April 2, 2020) (denying compassionate release of a 72-year old defendant where he had only served two months of a 33 month sentence); *United States v. Butler* No. 18 Cr. 834 (PAE), Dkt. 461, 2020 U.S. Dist. LEXIS 61021 (S.D.N.Y. Apr. 7, 2020) (denying compassionate release for a defendant with asthma because he had only served 15 months out of a 60 month sentence).

Instead, Haynes is asking that his sentence, which he has already served the *vast* majority of (89%), be reduced in light of his increased vulnerability to catastrophic health consequences should he contract COVID-19. Such a measure would still reflect the seriousness of his offense, but would also take into account the devastating consequences that COVID-19 could inflict on Haynes should he have to serve the rest of his sentence. Additionally, in light of FCI Milan's position of the quarantine unit over the unit housing those who have tested positive for COVID-19, Haynes humbly requests that this Court allow him to quarantine at his home, instead of within FCI Milan, should he be granted compassionate release or home confinement.

In short, Haynes is not a likely recidivist. He has taken responsibility for his actions and used the large span of time he spent behind bars to turn his life around. If this Court were to grant Haynes' motion, his sentence would only be reduced by the remaining 11% and his release would not endanger the public. He will get out of prison, and within months. The question is whether the theoretical penal benefits of the 11% remaining on his sentence are worth the risk of Haynes dying from COVID-19. Our answer is no.

## B. ALTERNATIVELY, THIS COURT SHOULD PERMIT HAYNES TO COMPLETE HIS SENTENCE IN HOME CONFINEMENT.

Should this Court decline to reduce Haynes' sentence to time served, Haynes moves this Court to allow him to complete the remaining 11% of his sentence via

home confinement. *Pomante*, 2020 U.S. Dist. LEXIS 85626 at *9 (imposing a "term of supervised release equal to the unserved portion of [the] original term of imprisonment"). Haynes would serve his sentence at his home at 6806 Varjo St., Hamtramck, MI 48212 with his wife and 11 year old son, where he would be able to isolate himself and better protect himself from COVID-19, rather than in a BOP facility with high infection rates. Without any sort of relief, there is a very real possibility that COVID-19 will transform Haynes' remaining 14 months in prison into a death sentence – as has already happened for three of his fellow inmates at FCI Milan, including one of his dear friends.

## III.    CONCLUSION

For the foregoing reasons, Defendant requests that this Honorable Court enter an order reducing his sentence.

Respectfully Submitted,

Date: June 19, 2020                    WADE FINK LAW P.C.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for Maurice Haynes*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
wade@wadefinklaw.com

## PROOF OF SERVICE

I hereby certify that on June 19, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for Maurice Haynes*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com