UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      Plaintiff,               Case No. 14-cr-20083

v.                        HON. LINDA V. PARKER
                          United States District Judge

MAURICE HAYNES,

      Defendant.

---

## UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Defendant Maurice Haynes is a career offender who was convicted of possession, with intent to distribute heroin. (PSR ¶ 27; R. 23 Order Accepting Defendant's Plea). Before he was convicted he had already accumulated seven drug trafficking convictions. (PSR ¶ 31-41). Defendant was sentenced to 120 months imprisonment. (R. 25: Judgment).

Haynes began serving his current sentence on February 3, 2015. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

1

Haynes does not qualify for compassionate release. For starters, because Haynes has not satisfied the mandatory exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A), the Court is barred from addressing his argument on the merits. *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694 (6th Cir. June 2, 2020). Haynes also does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Although Haynes' may be at a heightened risk from Covid-19 because he is overweight, he has not shown that he suffers from other significant medical conditions because of his weight such that it would qualify as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Haynes is not otherwise eligible for release. Haynes' offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under

2

§ 3582(c)(1)(A)—likewise do not support release.  Haynes' offense was not only serious, it was part of a pattern of undeterred criminal behavior involving 20 years of drug trafficking.  (PSR ¶ 31-41).

The Bureau of Prisons has also taken significant steps to protect all inmates, including Haynes, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities.[1] *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. To date, this process has already resulted in over 7,000 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities,"

---

[1] The specific information regarding FCI Milan in defendant's brief is historical. As of July 24, 2020, there are only 3 inmates and 1 staff member at FCI Milan who are positive for COVID-19.  *See* BOP Covid-19 Website.

3

*Wilson*, 2020 WL 3056217, at *11—the Court should deny Haynes'

motion for compassionate release.

## Background

On March 6, 2013, Michigan State Police troopers stopped a rental

vehicle driven by defendant for a traffic violation.  Defendant was found

to be in possession of two baggies containing distribution quantities of

heroin.  He also had 197 one-quarter inch square baggies and 98 one

inch baggies used to distribute controlled substances.  (PSR ¶ 12).

Haynes was released pending further investigation.  (PSR ¶ 13). Almost

one year later, a rental vehicle driven by Haynes was again stopped for

a traffic violation.  In Haynes' coat pocket were two baggies – one

containing heroin and one containing crack cocaine.  (PSR ¶ 14).

Haynes told officers he was transporting the drugs from Detroit to Flint

and had done so on five or six prior occasions.  (PSR ¶ 15). Haynes

pleaded guilty to possession with intent to distribute heroin.  (R. 20:

Rule 11 Plea Agreement; R. 23:  Order Accepting Guilty Plea). He was

held accountable for 54.5 grams of heroin, 11.79 grams of crack cocaine

and 16.7 grams of marijuana.  (PSR ¶ 16 & 21). Haynes had seven prior

drug trafficking convictions and was sentenced as a career offender.

4

(PSR ¶ 27& 44).  The probation officer determined that the sentencing guideline range for the offense was 151 to 188 months.  (PSR ¶  68). Even if defendant was not a career offender he had a criminal history score of 15 placing him in the highest criminal history category – criminal history category VI.  (PSR ¶  42-43). Defendant received a significant variance at sentencing (68 months) and was sentenced to 120 months imprisonment to be followed by 3 years of supervised release. (R. 25: Judgment).

Haynes began serving his prison sentence on February 3, 2015, and is currently incarcerated at FCI Milan. He has served slightly over 6 years (64.3%) of the 10 year sentence imposed. (Exhibit 2). He is 48 years old, and his projected release date is August 21, 2021. (Exhibit 2). Haynes underlying medical conditions include obesity and an elevated blood pressure without a diagnosis of hypertension.  (Exhibit 3 at 5-6). Defendant also claims to have asthma and respiratory issues.  However, neither claim is documented in the medical records provided by the Bureau of Prisons or included in the presentence investigation report. In fact, during Haynes most recent clinical encounter (7/15/2020) he denied having any headache, fever, chills, chest pain or shortness of

breath.  (Exhibit 3 at 66). Defendant has provided no medical records to support his allegations.  Nevertheless, Haynes has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic.

Haynes claims to have filed a request for home confinement on April 22, 2020.  The government has not been able to verify this allegation. Even so, Haynes did make a request to the Warden for compassionate release on June 9, 2020.  (Exhibit 1).  His motion however raises claims not included in the request submitted to the Bureau of Prisons. Therefore, he has not exhausted his administrative remedies.

## Argument

### I.  The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A.  The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of

Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths

7

and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a

prisoner in home confinement" during the Covid-19 pandemic.
Coronavirus Aid, Relief, and Economic Security Act (CARES Act)
§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).
The Attorney General has also issued two directives, ordering the
Bureau of Prisons to use the "various statutory authorities to grant
home confinement for inmates seeking transfer in connection with the
ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*
04-03-2020 Directive to BOP, at 1). The directives require the Bureau of
Prisons to identify the inmates most at risk from Covid-19 and "to
consider the totality of circumstances for each individual inmate" in
deciding whether home confinement is appropriate. (03-26-2020
Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.
Over 7,000 federal inmates have been granted home confinement since
the Covid-19 pandemic began, and that number continues to grow. BOP
Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts
show that "[t]he system is working as it should": "A policy problem
appeared, and policy solutions emerged." *United States v. Alam*, ___
F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

9

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught

10

committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C.

§ 60541(g)(2).

The Bureau of Prisons must also balance another important

consideration: how likely is an inmate to abide by the CDC's social-

distancing protocols or other Covid-19-based restrictions on release?

Many inmates—particularly those who have been convicted of serious

offenses or have a lengthy criminal record—been already proven

unwilling to abide by society's most basic norms. It is thus important to

evaluate "how . . . released inmates would look after themselves,"

*Wilson*, 2020 WL 3056217, at *11, including whether a particular

inmate would adhere to release conditions and social-distancing

protocols during the pandemic. If a prisoner would be unlikely to take

release conditions or Covid-19 precautions seriously, for instance, he

would also be far more likely than the general public to contract and

spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it

to marshal and prioritize its limited resources for the inmates and

circumstances that are most urgent. For any inmate who is a candidate

for home confinement, the Bureau of Prisons must first ensure that his

proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

To the extent Haynes asks this Court to order his release into home confinement, his motion must be dismissed for lack of jurisdiction.

### C. The Court should decline Haynes' request for a recommendation that he be granted home confinement.

The Court should also deny Haynes' request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to grant such a recommendation, Haynes is not a strong candidate for it. Haynes has a long criminal history. He has a 20-year history of drug trafficking and has not been deterred by even a lengthy term of incarceration. Haynes' also has a record of continued criminal conduct while on supervision. Thus his background suggests that his release into home confinement would quickly spiral into additional criminal conduct.

## II. The Court should deny Haynes' motion for compassionate release.

Haynes' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir.

13

2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at *1–*4.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be

14

"consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

15

### A. Binding authority prohibits the Court from granting release, because Haynes has not satisfied the statutory exhaustion requirement.

The Court must dismiss Haynes' motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *2 (6th Cir. June 2, 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when

16

the government raises it. *Id.* at *1–*4; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

Section 3582(c)(1)(A) also means that an inmate may not move for compassionate release on a different ground than the one he raised during the administrative process. The whole point of § 3582(c)(1)(A)'s exhaustion requirement is to ensure that the Bureau of Prisons has the opportunity to evaluate and consider an inmate's request first, while allowing the inmate to seek relief in court if the Bureau of Prisons denies or fails to act upon the request. *Alam*, 2020 WL 2845694, at *4. So when "the factual basis in the administrative request and the motion before the court are different, a defendant does not satisfy the exhaustion requirement because he does not give the BOP an opportunity to act on the request before [he] brings his request to the courts." *United States v. Asmar*, No. 18-20668, Order at 7–8 (E.D. Mich. June 5, 2020); *accord United States v. Mogavero*, No. 15-00074, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) ("Proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden."); *United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020); *United States*

17

*v. Valenta*, 2020 WL 1689786, at \*1 (W.D. Pa. Apr. 7, 2020). An inmate seeking relief based on Covid-19 must first make *that* request to the Bureau of Prisons before seeking relief in court. *See Alam*, 2020 WL 2845694, at \*4 (emphasizing the claim-specific nature of exhaustion).]

Haynes did not comply with § 3582(c)(1)(A)'s mandatory exhaustion requirement. Haynes' only request for compassionate release is for a non-Covid-19 related reason. (Exhibit 1). On June 9, 2020, defendant sought consideration for compassionate release based on his age and the time he had left to serve on his sentence. (*Id.*). The instant motion raises different arguments and therefore Haynes' motion for compassionate release should therefore be dismissed for failure to exhaust. *Alam*, 2020 WL 2845694, at \*5.

### B. Haynes is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even if Haynes had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under

18

§ 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Haynes and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

20

Haynes' age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Haynes is an obese 47-year old who complains of a history of asthma, lung and blood pressure issues.  Haynes has provided no medical support that he has asthma.  Haynes makes no mention of this condition in the presentence investigation report or during Bureau of Prisons medical screening. Haynes has also not provided medical documentation of any ongoing lung or respiratory issue.  It is true that Haynes was shot in the lung 17 years ago, but at the time the presentence investigation report was prepared he reported "no lasting impact from this injury." (PSR ¶ 52 p 13). And, although he had an upper respiratory infection in May 2015 his Bureau of Prisons medical records are void of any other lung distress, breathing or respiratory issues while incarcerated.  (Exhibit 3). In fact during a medical visit on July 15, 2020 Haynes denied any issues related to chest pain or shortness of breath.  (Exhibit 3 at 66).

While incarcerated Haynes' blood pressure has on occasion been slightly elevated however he was not diagnosed with hypertension. (Exhibit 3 at 5-6). He has refused medication as a treatment option.

(Exhibit 3 at 60-62). Further, his blood pressure reading in February 2020 was within a normal range. (Exhibit 3 at 45-46). So it appears that any issue related to an elevated blood pressure is not severe as he did not need medication for his blood pressure to return to normal. On July 15, 2020 defendant again had an episode with an elevated blood pressure. (Exhibit 3 at 66-67). Medical staff at the facility noted that defendant's blood pressure should be monitored for 30 days and recommended a treatment plan that included a low-salt diet and exercise. (*Id.*).

Haynes' medical records, however, confirm that he has a BMI of over 30, which the CDC has identified as a risk factor for Covid-19. (Exhibit 3 at 4-6). Given the heightened risk that Covid-19 poses to someone with that medical condition this Court may find that he has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A). However, his obesity does appear to be sever. Other than random episodes of elevated blood pressure he overall seems to be in good health. Except for his weight, Haynes has provided no evidence to support his claim that he suffers from medical conditions that place him at a higher risk

22

form COVID-19. Haynes current health does not fit within the kinds of grave, end-of-life medical conditions contemplated by Congress. So whether considered alone or in combination with the Covid-19 pandemic, Haynes' age and general health do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

But Haynes also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). The Sixth Circuit has made clear that even run-of the mill drug dealers without any indication they are engaged in violence are dangerous – "drug trafficking is a serious offense that, in itself poses a danger to the community." *Id., see also, United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under

§ 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Israel*, No. 17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017) (recognizing that "economic harm may qualify as a danger" foreclosing release).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public

safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Haynes has a long criminal history that began at age 18. (PSR ¶ 31). At the time he was sentenced in this case he had eleven prior drug related offenses, including several drug trafficking convictions. (PSR ¶ 31-41). And at least one of Haynes' prior convictions involved a firearm. (PSR ¶ 33). He has not been deterred from criminal conduct despite prior sanctions including lengthy terms of imprisonment. Haynes has incurred significant misconducts while incarcerated, absconded from a detention facility and has repeatedly violated supervision rather than making an effort to reform himself.

Because Haynes' release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A).

Haynes is not eligible for compassionate release.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that

release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Haynes eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of Haynes' offense do not support granting early release. Haynes was involved in year-long activity involving drug trafficking from Detroit to Flint, Michigan. (PSR ¶ 12-15). His conduct is part of a pattern of behavior exhibited by defendant for over twenty years. (PSR ¶ 31-41). Haynes' history and characteristics weigh against compassionate release as he has been

involved with the criminal justice system since age 18 – his entire adult life. (PSR ¶ 31). Defendant is a career offender who has eleven prior convictions including seven trafficking offenses. (PSR ¶ 31-41). At least one prior offense involved a firearm. (PSR ¶ 33). Prior arrests and lengthy terms of imprisonment have not deterred Haynes from criminal conduct as he continues to engage in drug trafficking even while on court supervision. Further, other court's efforts to use alternatives to incarceration have not proven effective to change Haynes' behavior. Haynes has served slightly more than 6 years (64%) of the ten-year sentence imposed and similar sentences have not been enough to deter Haynes from criminal behavior. Haynes has already received a significant variance from his career offender guideline range and balancing the § 3553(a) show that this Court should not reduce Haynes' sentence.

Haynes also asks the Court to give weight to the Bureau of Prisons recommendation that he be moved to a Residential Reentry Center (RRC) on November 24, 2020. This placement however does not terminate defendant's sentence. RRC placement is a carefully planned and well regulated mechanism of the Bureau of Prisons to assist an

inmate to transition back into society.  *See* BOP website About Our
Facilities. The Bureau of Prisons has classified defendant as a medium
risk for recidivism which is the second highest level for recidivism.
(Exhibit 2).  As such, Haynes would benefit from the structured and
supervised environment at the RRC. If the court were to grant
defendant's motion he would not get the benefit of RRC placement
which is designed to help integrate inmates to community living and
thereby help minimize the risk of recidivism.  RRC placement helps
inmates gradually rebuild community ties which in turn increases an
inmate's chances of success when he ultimately leaves Bureau of
Prisons custody.  Further, because Haynes would remain in Bureau of
Prisons custody while at the RRC if he were to violate any conditions of
the placement the Bureau of Prisons could directly and immediately
address the situation thereby minimizing any potential risk to the
community.  Given Haynes' history of repeat offenses transitioning him
straight from custody to supervised release would lessen the likelihood
of successful community integration and increase the chance that he
would reoffend.

III. If the Court were to grant Haynes' motion, it should order a
14-day quarantine before release.

If the Court were inclined to grant Haynes' motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Haynes' motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/ NANCY A. ABRAHAM*
Assistant United States Attorney
600 Church Street
Flint, MI  48502
(810) 766-5177

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

All Attorneys of Record

Dated: July 24, 2020          s/ Kristi Bashaw, Legal Assistant
United States Attorney's Office