UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                  Criminal Case No. 14-20083
                                  Honorable Linda V. Parker

v.

MAURICE HAYNES

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S REQUEST FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582**

On September 4, 2014, Defendant pleaded guilty pursuant to a plea agreement to one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). On February 3, 2015, this Court sentenced Defendant to 120 months of incarceration. (ECF No. 25.) The matter is currently before the Court on Defendant's Emergency Motion to Reduce Sentence Under 18 U.S.C. § 3582, filed June 19, 2020 (ECF No. 26), for which he filed a supplemental brief on July 10, 2020 (ECF No. 30.) The motion has been fully briefed. (ECF Nos. 33, 36.)

**Applicable Law**

Under § 3582, a court may reduce a defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C.] section 3553(a) to the extent they

are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that a reduction is consistent with applicable statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A)(i).  The defendant bears the burden of proving that "extraordinary and compelling reasons" exist to justify release under the statute.  *See United States v. Rodriguez*, 896 F.2d 1031, 1033 (6th Cir. 1990) (concluding that the burden of proving facts that could decrease a potential sentence fall upon the defendant); *see also  United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").  Here, Defendant seeks compassionate release in light of the novel coronavirus (COVID-19), along with his age (48 years old) and medical conditions (obesity, hypertension, and a history of asthma and smoking) which he contends increase his risk of serious outcomes if he contracts the virus.

A defendant may move for compassionate release under § 3582(c)(1)(A) only after "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  § 3582(c)(1)(A).  This exhaustion requirement is mandatory. *United States v. Alam*, 960 F.3d 831, 832, 834 (6th Cir. 2020).  Although recognizing the need for a prompt resolution of a prisoner's request for release

during this pandemic, the *Alam* court concluded that the exhaustion requirement must be followed and is not subject to "equitable carveouts," reasoning:

> Speed matters, yes. But accuracy matters too. Preventing prisoners from charging straight to federal court serves important purposes. It ensures that the prison administrators can prioritize the most urgent claims. And it ensures that they can investigate the gravity of the conditions supporting compassionate release and the likelihood that the conditions will persist. These are not interests we should lightly dismiss or re-prioritize.

*Id.* at 835.

A number of district courts have concluded that the exhaustion requirement is not satisfied where the factual basis for relief in the prisoner's administrative request and the motion filed before the court differ, reasoning that this "does not give the [Bureau of Prisons] an opportunity to act on the request before [seeking relief from] the courts." *United States v. Asmar*, -- F. Supp. 3d --, 2020 WL 3163056, at *3 (E.D. Mich. June 5, 2020) (citing *United States v. Mogavero*, No. 15-00074, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020)); *see also United States v. Hernandez*, No. 13-CR-4467, 2020 WL 3051105, at *4 (S.D. Cal. June 5, 2020) (finding that to satisfy the exhaustion requirement, "the administrative request must raise the same basis for relief as the federal court filing."); *see also United States v. Valenta*, No. 15-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020) (concluding that in order "to give the BOP an opportunity to address the issue . . . the administrative complaint must raise the same claims asserted in the

3

federal court filing."). On the other hand, some district courts "have been skeptical of the notion that the statute imposes any requirement of 'issue exhaustion' on requests for compassionate release …." *United States v. Williams*, No. 15-20462, 2020 WL 4040706, at *2 (E.D. Mich. July 17, 2020) (citing *United States v. Garner*, No. 14-13, 2020 WL 3632482, at *3 & n.2 (S.D. Tex. July 3, 2020)); *see also United States v. Hamrick*, No. 1:19-CR-91, 2020 WL 4016037, at *3 (M.D. N.C. July 16, 2020) (because compassionate release requests to the warden "are almost always" made on a pro se basis "courts will usually read such requests to the warden liberally, but not so broadly as to make the exhaustion requirement meaningless.") As one district court recently concluded: "The exhaustion requirement should not be applied hyper-technically, and the request to the warden need not be identical in detail or specificity to the motion made in court." *United States v. Knight*, No. 1:15-CR-393, 2020 WL 4059886, at *2 (M.D. N.C. July 20, 2020).

## Analysis

### Whether Defendant Has Exhausted His Administrative Remedies

Defendant claims that he submitted a request for release to his warden on April 22, 2020. While the Bureau of Prisons (BOP) allegedly was unable to locate Defendant's request, Defendant submitted a second request on June 9, 2020, which the Government acknowledges was received. (*See* Resp. at 6, ECF No. 33 at Pg ID

4

278, *id.* Ex. 1, ECF No. 33-2 at Pg ID 303.)  At least thirty days passed between the submission of this second request and the filing of Defendant's supplemental brief in support of his motion for compassionate release.

The Government nevertheless maintains that Defendant has not satisfied the mandatory exhaustion requirement because his *pro se* request to the warden and pending motion do not assert the same factual basis for release.  In his communication to the warden, requesting compassionate release expressly under § 3582(c)(1)(a), Defendant referred to his age, the near completion of his sentence, and the fact that he received "a half-way house date of [N]ov[ember] 24th 2020." (Resp. Ex. 1, ECF No. 33-2 at Pg ID 303.)  Defendant did not mention COVID-19 or any medical condition.

However, by referring to § 3582(c)(1)(a) specifically, Defendant informed the warden that he was seeking release based on "extraordinary and compelling circumstances."  The warden clearly understood that Defendant was seeking relief due to the COVID-19 pandemic, as reflected in the warden's response to Defendant's request.  (*See id.* at 2, Pg ID 304.)  While Defendant did not specify the medical conditions that he now claims places him at heightened risk if he contracts the virus, it can be presumed that the BOP was well-aware of at least Defendant's obesity and high blood pressure when his request was denied.  Both conditions are documented in Defendant's prison medical records.  (*See* ECF No.

5

34.)  As the Sixth Circuit's decision in *Alam* reflects, prison administrators are expected to investigate a prisoner's conditions when presented with a request for release.

For these reasons, the Court finds that Defendant's pro se administrative request, when read liberally, provided enough information to alert the warden of the factual basis on which he now seeks relief.  The Court therefore concludes that Defendant exhausted his administrative remedies.

## Whether a Reduction is Warranted

The Court finds that, in combination, Defendant's age, medical conditions, and the conditions at his place of confinement due to COVID-19 present extraordinary and compelling circumstances warranting a sentence reduction.  The Court does not find that his release poses a sufficiently serious danger to the community to warrant the denial of his motion.

It is widely acknowledged, based on expert guidance, that there is a greater risk of COVID-19 infection for incarcerated individuals.  Moreover, the risk of experiencing serious outcomes if one is infected increases with age and underlying health conditions.  Notably, medical experts are continuously gaining insight as to how this new virus affects individuals with particular medical conditions and the list of underlying conditions exposing individuals to the risk of more serious outcomes is evolving.  At this point, however, there is no vaccine and the virus can

cause severe complications or death.  No one can seriously deny that the COVID-19 pandemic is extraordinary and unprecedented in modern times and that it poses a danger to everyone.

The Centers for Disease Control (CDC) previously stated that only individuals over 65 years of age were at increased risk of severe illness from COVID-19.  Based on recent data, however, the CDC has modified this position and now advises that the risk of severe illness increases with age.  *see* [https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html](https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html) (visited Aug. 11, 2020).  According to the CDC, for individuals 40-49 years old, the risk of being hospitalized or dying from COVID-19 is three and ten times higher, respectively.  *See* [https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html](https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html) (visited Aug. 11, 2020.)  Defendant's weight also places him at increased risk if he contracts COVID-19.  Defendant has a body mass index (BMI) of 33.9.  According to the CDC, individuals with a BMI over 30 are three times more likely to be hospitalized if they contract COVID-19.  *See* [https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html](https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html) (visited Aug. 11, 2020.)  While prison medical staff have not diagnosed Defendant with hypertension, his medical records reflect repeated episodes of high blood pressure.  (ECF No. 34.)  The CDC

indicates that individuals with hypertension also are three times more likely to be hospitalized if they contract the virus. *See id*.

Moreover, COVID-19 is more easily transmitted within communal living and densely packed environments, such as prisons. This has been demonstrated at the Milan facility, where Defendant is incarcerated. As of August 11, 2020, 95 inmates and 56 staff members at the facility have tested positive for the virus, and there have been three COVID-19 related deaths. *See https://www.bop.gov/coronavirus* (visited Aug. 11, 2020). But reported rates of infection are meaningless without adequate testing. Of the 1,363 inmates at the Milan facility, *see https://www.bop.gov/coronavirus/*, only 364 have been tested for COVID-19. *https://www.bop.gov/about/statistics/population_statistics.jsp*. The BOP's failure to implement any comprehensive prophylactic testing program calls into question whether the above figures grossly under count the rates of infection within the facility.

Defendant's age and medical conditions, combined with the likely spread of COVID-19 within correctional settings where social distancing is impossible, diminishes his ability to "provide self-care" for his medical conditions, thereby satisfying the Sentencing Commission's statement as to when a reduction is appropriate. *See* U.S.S.G. § 1B.13.

8

For these reasons, the Court finds extraordinary and compelling circumstances warranting Defendant's release and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" Consideration of the factors set forth in 18 U.S.C. § 3553(c) also leads the Court to conclude that a reduction is appropriate.

Defendant "is not a danger to the safety of any other person or to the community" as required for compassionate release. *See* 28 U.S.C. § 3582(c)(1)(A) (providing that a reduction in sentence must be "consistent with applicable policy statements issued by the Sentencing Commission"); U.S.S.G. § 1B1.13. Defendant is a repeat offender, with a history of convictions for drug distribution. (*See* PSR ¶¶ 31-41.) However, he also has a lengthy history of drug use and his prior convictions involved relatively small quantities of drugs. (*Id.* ¶¶ 19, 31-41, 51, 55-56.) Nothing in Defendant's criminal history reflects a threat of violence other than an indication in his PSR that a firearm was found in the vehicle in which Defendant was a passenger during a stop that led to his 1992 possession with intent to distribute cocaine conviction. (*See* PSR ¶ 33.) While the PSR reflects that Defendant's fingerprints were found on the weapon, nothing in the record indicates that it had been used in furtherance of his drug dealing. Moreover, Defendant was not ultimately charged with a firearm offense under the plea agreement.

9

The Government nevertheless argues that Defendant is a danger to the community, quoting the Sixth Circuit's statement in *United States v. Stone*, 608 F.3d 939 (6th Cir. 2010), that it "routinely affirms, on dangerousness grounds, the pretrial detention of run-of-the mill drug dealers, even without any indication that the defendant has engaged in violence." (Resp. at 23, ECF No. 33 at Pg ID 295) (quoting *Stone*, 608 F.3d at 947 n.6).) For the same proposition, the Government cites *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020), which quotes *Stone*. But as this Court recently indicated in another case:

> [T]he circumstances of those cases suggest that the quoted language is stated in terms that are far too general and that the Government should use more care when citing them.
>
> *Stone* involved a defendant who was a member of a group that had acquired a significant arsenal of weapons, trained as a paramilitary organization, and contemplated murdering civilians and law enforcement officers. 608 F.3d at 944. He was charged with, among other violations, seditious conspiracy, attempted use of weapons of mass destruction, and carrying and using firearms during and in relation to crimes of violence. *Id*. The defendant in *Knight* had pleaded guilty to conspiracy to distribute controlled substances and possessing a firearm as a convicted felon. 2020 WL 3055987, at *1. The conspiracy involved a "pill mill" scheme where 125,000 dosage units of medically unnecessary oxycodone were distributed to patients in exchange for cash. *Id*. The firearm conviction involved an AK-47. *Id*. In stark contrast here, Defendant's current and prior convictions involve marijuana and do not reflect the use of any weapon or violence.

10

*United States v. Dean*, No. 11-20195, 2020 WL 4251344, at *3 (E.D. Mich. July 24, 2020).

While incarcerated, Defendant has completed programs to address his drug abuse, as well as courses in Microsoft, parenting, job interviewing, money management, and political science. (*See* ECF No. 36-2 at Pg ID 407-08.) He also is working towards his associate degree in business management. (*See id.*) The Government asserts that Defendant has incurred significant misconducts while incarcerated and repeatedly violated supervision (Resp. at 25, ECF No. 33 at Pg ID 297), presumably referring to conduct that occurred in 1997, when Defendant was 25-years old. (*See* PSR ¶¶ 33-34.) More recently, Defendant has completed his probationary periods without incident. (*Id.* ¶¶ 38-39, 41.) Defendant's Summary Reentry Plan – Progress Report reflects only one disciplinary action, in November 2016, for "being unsanitary or untidy." (ECF No. 36-2 at Pg ID 408.)

Lastly, Defendant has served a significant portion of his sentence. According to the BOP's calculations, he has served 74.6% of his statutory term. Defendant has been told that he is eligible for release to a halfway house in either November 2020 or February 2021. Defendant will have significant support from family members upon his release. They remain loyal and committed to his rehabilitation. The manager of a cleaning service company in Detroit, Michigan,

has offered Defendant a position with the company upon his release, working forty hours a week at $12 per hour. (ECF No. 26-1 at Pg ID 116.)

## Conclusion

For the foregoing reasons, the Court is **GRANTING** Defendant's request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The Court reduces Defendant's sentence to time served. The Bureau of Prisons is authorized to delay execution of this Order for up to seven days after its issuance to make necessary arrangements related to Defendant's release. Nevertheless, the Bureau of Prisons is directed to proceed as expeditiously as possible to avoid any unnecessary delay. The Court leaves undisturbed the three-year period of supervised release.

Upon his release, Defendant shall remain in self-quarantine for 14 days. He shall notify the Probation Department for the Eastern District of Michigan within 24 hours of his release and is directed to follow the instructions of the assigned probation officer. He is subject to the same conditions of release imposed in his original sentence.

**IT IS SO ORDERED**.

s/ Linda V. Parker  
LINDA V. PARKER  
U.S. DISTRICT JUDGE

Dated: August 13, 2020